IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

DONALD A. ZALIMENI, JR.,        )
      Plaintiff,            )
                          )
v.                           )     CIVIL ACTION: 1:19-00245-KD-C
                          )
COOPER MARINE and TIMBERLANDS  )
CORP., *et al.*,               )
      Defendants.         )

ORDER

This matter is before the Court on Defendants' motion for summary judgment (Doc. 49), Plaintiff's Response (Doc. 51) and Defendants' Reply (Doc. 53); and Defendants' motion to strike (Doc. 52), Plaintiff's Opposition (Doc. 57) and Defendants' Reply (Doc. 60).

I.    **Motion to Strike**

Defendants move to strike three (3) paragraphs of Dr. Bartholomew's October 1, 2020 Declaration regarding Zalimeni: **Paragraph 8** (neck/cervical spine medical causation); **Paragraph 8 (**that he undergo additional tests and possible treatment for Zalimeni's neck/cervical spine complaints - that he has not reached MMI and is in need of diagnostic testimony and possibly treatment); **Paragraph 9** (for his shoulder complaints -- that he has not reached MMI and is in need of diagnostic testing and possible orthopedist referral for the shoulder); and **Paragraph 11** (that he has not reached MMI for direct injuries to his left hand and fingers) (Doc. 52 at 3, 6, 8-9). The specific objected-to statements by Dr. Bartholomew consist of the following:

> 8.  The medical history shows Mr. Zalimeni had previously undergone an anterior cervical fusion, and based on the mechanism of injury, I believe it is likely Mr. Zalimeni aggravated his pre-existing cervical spine condition in the work injury. Further, Mr. Zalimeni is not at maximum medical improvement for that condition

1

and is in need of diagnostic testing and possibly treatment. My opinion on this is consistent with the opinions of Dr. Kopp, whose records I reviewed.

9.  Also, based on the mechanism of injury, I believe it is likely Mr. Zalimeni's left shoulder complaints are related to the work injury, that is, an aggressive pulling or yanking of the  pinned left hand likely caused the shoulder complaints. Further, Mr. Zalimeni is not at maximum medical improvement for the shoulder complaints and he is in need of diagnostic  testing, and depending on the result of that testing, possibly a referral to an orthopedist[] for treatment.

\*\*\*

11. I further do not believe Mr. Zalimeni is at maximum medical improvement for the direct injuries to the left hand and fingers.

Doc. 51-6 (Decltn. Bartholomew at ¶¶8-9, 11).

The grounds for Defendants' motion to strike are set forth as follows: Dr. Bartholomew is a "retained expert"[1] (versus treating physician);[2] his medical causation opinion was untimely disclosed (Doc. 53 at 1, Doc. 52 at 1); and his opinion lacks sufficient foundation and is based on insufficient facts/data/speculation.[3]  Defendants move to strike Dr. Bartholomew's Declaration statements -- as an expert witness -- that:

-Re: Causation of cervical pain: there is a causal relationship between Zalimeni's cervical issues and the accident, as his opinion is untimely;
-Back/Hand: regarding Zalimeni's back or hand issues, as Dr. Bartholomew is not an orthopedist and lacks the qualifications;
-MMI cervical: Zalimeni is not at MMI and may need future medical care for cervical issues, as mere speculation and lacking sufficient foundation;
-MMI shoulder: Zalimeni is not at MMI and may need future medical care for his shoulder issues, as mere speculation and lacking sufficient foundation;
-MMI hand: Zalimeni is not at MMI for his hand, as such opinion was not timely disclosed and lacks sufficient foundation.

---

1 Defendants preserved this issue in their motion for summary judgment.  (Doc. 49 at 7).

2 Per Defendants, this is because he was seen after litigation commenced, over 3 years post-accident, the attorney referred him, the attorney paid the bill, and he "merely examined" Zalimeni but did not treat him.  (Doc. 52 at 1-2).  The Court is not persuaded.

3  Per Defendants, Dr. Bartholomew "does not even attempt to explain how or why" the pulling/yanking injury could cause no shoulder problems for such a long period of time post-accident but then "magically manifest."  (Doc. 53 at 4).

(Doc. 52 at 10).

First, the Court turns to whether Dr. Bartholomew's statements in the three paragraphs of the October 1, 2020 Declaration were untimely disclosed.  This is informed by Dr. Bartholomew's status.  This is because treating physicians and expert witnesses are subject to different disclosure requirements under the <u>Federal Rules of Civil Procedure</u>, Local Rules, and the Court's Scheduling Order.  So, the Court must first decide whether Dr. Bartholomew is a fact or an expert witness, as that classification determines whether Zalimeni timely satisfied his disclosure obligations to the Defendants.

Defendants assert that Dr. Bartholomew is an expert witness.  As grounds, Defendants assert that: 1) Zalimeni was treated by Dr. Bartholomew after he had already filed this lawsuit, for the first time in August 2019 (over (3) years post-accident), per the referral of, and at the expense of, his attorney; 2) Dr. Bartholomew "merely examined" Zalimeni twice but did not conduct any procedures or treatment; and 3) Dr. Bartholomew is now testifying as to causation.  From that premise, Defendants contend Zalimeni did not provide timely "expert disclosures" for Dr. Bartholomew, only office notes/treatment records from the 2019 appointments -- in which he did not give any opinion regarding causation.  Defendants then reference Dr. Bartholomew's October 1, 2020 Declaration, which suddenly speaks to causation regarding cervical/neck pain, as untimely "expert opinion" and due to be stricken.

In response, Zalimeni contends that Dr. Bartholomew is a treating physician, not an expert witness, and that his "treatment recommendations and diagnosis were based on facts and personal observation of Zalimeni during his clinic visit and after reviewing the records and diagnostic test results."  (Doc. 57 at 5).  Zalimeni adds that he has repeatedly disclosed Dr. Bartholomew as a

3

treating physician to Defendants throughout this case, and in a timely manner in keeping with the Phase I and Phase II schedules.  Zalimeni asserts further that "Dr. Bartholomew was not required to develop an opinion on causation in anticipation of litigation or for trial. His treatment was only the next step in following up on Dr. Kopp's diagnosis and treatment plan."  (Doc. 57 at 4).

This record reflects that from the beginning of this litigation, Defendants were placed on notice that Zalimeni would rely on Dr. Bartholomew's testimony as a treating physician -- not an expert witness.  Specifically, the schedule and deadlines for this case were ordered via two phases: Phase I -- August 2019 to the end of March 2020 (motion deadlines etc., and limited discovery on the underlying causes of Zalimeni's late filing of the complaint); and Phase II -- April 2020 forward (discovery, motion deadlines, etc. for the remaining issues/claims).  (Docs. 15, 32).   At the very beginning of Phase I, Zalimeni identified Dr. Bartholomew as one of his treating physicians, as in August 2019 he supplied Defendants with a copy of Dr. Bartholomew's initial narrative clinic note/treatment record and later clinic note/treatment record, recommendations and treatment orders. (Doc. 57-1 at 1-8).  In September 2019, Zalimeni also provided Defendants with the names, contact information, and clinic notes for all of the doctors Zalimeni expected to testify at trial -- identifying Dr. Bartholomew on the supplemental preliminary witness list and identifying his medical records on the supplemental preliminary exhibit list (September 10, 2019 Supplemental Initial Disclosures (Doc. 57-1 at 9-10 ("Testimony will concern medical facts, examinations, evaluation, treatment, diagnostic tests, medical history, opinions, physical therapy, Plaintiff's physical condition and complaints[]")).  In November 2019, as part of supplemental answers to discovery and responses to requests for production, Zalimeni provided additional medical records from Dr. Bartholomew to the Defendants.   (Doc. 57-1 at 14 (identifying "2019.09.03 MR").

Moreover, during discovery, Defendants supplied Dr. Bartholomew's treatment records ("14.Medical Records- Dr. Barth[o]lomew [BJB 000001- 000174]") to their medical expert, Clinton W. Howard IV, M.D. for his comment and review (i.e., Defendants had to have those records in hand -- as produced from Zalimeni -- for same).  (Doc. 57-2 at 1-3).

In April 2020, the Phase II Rule 16(b) Scheduling Order issued.  (Doc. 32).  Per same, discovery closed August 31, 2020, Rule 26(a)(2) expert reports were due from Zalimeni by July 1, 2020, and Rule 26(a)(2)(C) disclosures were due from Zalimeni by July 1, 2020.  (Doc. 32 at 2-3).  Additionally, the parties agreed, for treating physician testimony: "[w]hile a treating physician might not be considered a retained expert, any party that intends to introduce testimony from a treating physician, either live or by deposition, must identify that treating physician by the deadlines for expert reports identified above. The parties agree that any report prepared in relation to a Rule 35 medical exam shall be delivered within a reasonable time after the examination."  (Id. at 3 at ¶6).  At the very beginning of Phase II, on April 1, 2020, Zalimeni notified Defendants via email that because Dr. Bartholomew has a written report recommending further treatment for Zalimeni, he was not "consider[ed]" a "retained expert[] under Rule 26."  (Doc. 57-2 at 1).  On April 9, 2020, there was discussion among the parties as to Defendants' taking Dr. Bartholomew's deposition. (Doc. 57-3 at 3-4 (4/9/20 emails referencing taking his deposition and providing Defendants' Phase II interrogatories, requests for production and requests for admission)).  However, Defendants did not do so.  While Zalimeni had already repeatedly identified Dr. Bartholomew, his April 21, 2020 Initial Disclosures *again* identified Dr. Bartholomew (Doc. 57-3 at 8 ("Testimony will concern medical facts, examinations, evaluation, treatment, diagnostic tests, medical history, opinions, physical therapy, Plaintiffs physical condition and complaints, and

5

whether plaintiff has reached maximum medical improvement for incident related injuries.")).

Still, Defendants did not take Dr. Bartholomew's deposition and/or raise any issues with Zalimeni

as to his treating physician status -- until moving for summary judgment on September 14, 2020.

The record makes clear then, that Zalimeni limited Dr. Bartholomew's status and opinions/reports

to that of a treating physician. Defendants' recharacterization of Dr. Bartholomew as an expert

witness at this juncture does not change that designation.

Given Dr. Bartholomew's designation as a treating physician, his testimony is limited, i.e.,

any testimony, opinion, statements, and/or reports regarding causation or hypotheses for same, are

excluded unless a determination of causation was necessary for treatment. As summarized in

Pringle v. Johnson & Johnson, 2019 WL 6723822, *1-3 (S.D. Fla. Dec. 11, 2019), treating

physicians' opinions are limited to lay witness testimony as to observations and decisions during

treatment, and cannot address causation (or hypotheses regarding same):

> Rule 26 was amended effective December 2010....While Rule 26(a)(2)(A) requires
> the disclosure of any witness who will give testimony under Rules 702, 703, or 705,
> Rule 26(a)(2)(C)[1] requires only a lesser disclosure of subject matter and a summary
> of facts and opinions in expected testimony for any witnesses who do not fall into
> the categories in Rule 26(a)(2)(B) (retained or specially employed to provide expert
> testimony in the case....).....
>
>         ***
>
> ....Treating physicians are particularly contemplated as likely candidates for the less
> burdensome disclosure obligations of Rule 26(a)(2)(C). *See* Fed. R. Civ. P. 26
> advisory committee's note to 2010 amendment (specifically identifying "physicians
> or other health care professionals" among "[f]requent examples" of witnesses who
> may testify as fact witnesses and offer expert testimony without requiring a report
> under Rule 26(a)(2)(B), but will now need to be identified under Rule 26(a)(2)(A)
> and provide summary disclosures under Rule 26(a)(2)(C)); *Bostick v. State Farm
> Mutual Automobile Insur. Co.*, 16–cv–1400, 2017 WL 2869967 (M.D. Fla. July 5,
> 2017) (treating physicians were not required to provide written reports because they
> were not retained or specially employed to provide expert testimony, but plaintiff
> was required to comply with Rule 26(a)(2)(C) for treating physicians to testify
> beyond observations made during course of their treatment); *Sweat v. United States*,
> 14-cv-888, 2015 WL 8270434 (M.D. Fla. Dec. 8, 2015) (full reports required if

physicians were asked to give opinions beyond those procured directly from treatment of plaintiff); *Blakely v. Safeco Insur. Co. of Illinois,* 13–cv–796, 2014 WL 1118071 (M.D. Fla. Mar. 20, 2014) (physicians may testify to their opinions, based on their personal observations made while treating plaintiff, but any additional opinions plaintiff might seek to elicit from these health care professionals are inadmissible because plaintiff failed to provide full written disclosures required by Rule 26(a)(2)(B)); *In re Denture Cream Products Liability Litigation*, No. 09–2051–MD, 2012 WL 5199597 (S.D. Fla. Oct. 22, 2012) (although full reports were required from physicians, court declined to strike experts' partial disclosures because reports could be provided before close of discovery); *see also Banister v. Burton*, 636 F.3d 828 (7th Cir. 2011) (detailed discussion and collection of cases summarizing what is and is not proper testimony for a treating physician).

The advisory committee notes on Rule 26 cites treating physicians and healthcare professionals as common examples of "hybrid" witnesses exempt from proving the expert disclosure requirements set forth in Rule 26(a)(2)(B). *See* Fed. R. Civ. P. 26 advisory committee's note to 1993 and 2010 amendments. When physicians testify regarding opinions "formed and based upon observations made during the course of treatment" of a patient, a Rule 26(a)(2)(B) report is not necessary. *In re Denture Cream*, No. 09–2051–MD, 2012 WL 5199597, at *4 (S.D. Fla. Oct. 22, 2012) (internal quotation marks and citation omitted); *Wilson v. Taser Int'l., Inc.*, 303 F.App'x 708, 712-13 (11th Cir. 2008) (finding treating physician's testimony regarding his diagnosis of plaintiff's spine injury admissible "as lay testimony without the [need to conduct a] *Daubert* analysis"); *Williams v. Mast Biosurgery U.S.A., Inc.*, 644 F.3d 1312, 1317 (11th Cir. 2011) (quoting with approval a Tenth Circuit opinion stating that "[a] treating physician is not considered an expert witness if he or she testifies about observations based on personal knowledge, including the treatment of the party"); *Principi v. Survivair, Inc.*, 231 F.R.D. 685, 692 (M.D. Fla. 2005) (stating that "[a] treating physician is not an 'expert' witness if he or she testifies about observations based on personal knowledge, including the treatment of a party," and finding a treating physician's diagnosis and prognosis testimony lay opinion testimony subject to Rule 701); *Bryan v. Whitfield*, 14–CV–341, 2015 WL 3407485 (N.D. Fla. Mar. 16, 2015); *Torres v. Walmart Stores East, L.P.*, 16-CV-60984, 2017 WL 8780915 (S.D. Fla. June 9, 2017).

However, even treating physicians may be subject to section (2)(B) if they offer opinions that extend beyond their treatment of a patient or if they form opinions upon review of information provided by an attorney or in anticipation of litigation. *See In re Denture Cream*, No. 09–2051–MD, 2012 WL 5199597, at *4 (S.D. Fla. Oct. 22, 2012) (citations omitted); *see also Kondragunta v. Ace Doran Hauling & Rigging Co.*, No. 11-CV-01094, 2013 WL 1189493, at *12 (N.D. Ga. Mar. 21, 2013) ("If, however, the physician's opinion was based on facts gathered outside the course of treatment ... or if the physician's testimony will involve the use of hypotheticals, then a full subsection B report will be required." (alteration added;

citations omitted)); *Lebron v. Royal Caribbean Cruises, Ltd.*, 16-CIV-24687, 2018 WL 4539706, at *5 (S.D. Fla. Sept. 21, 2018).

The Eleventh Circuit Court of Appeals has acknowledged that "special evidentiary problems" exist with respect to testimony from treating physicians, and it has instructed courts to ensure that the reliability requirements set forth in Rule 702 of the Federal Rules of Evidence are not "evaded through the simple expedient of proffering an expert in lay witness clothing." *Williams v. Mast Biosurgery USA, Inc.,* 644 F.3d 1312, 1316–17 (11th Cir. 2011) (quoting *United States v. Henderson,* 409 F.3d 1293, 1300 (11th Cir. 2005)). In *Henderson*, the Eleventh Circuit explained that where a doctor did not need to determine how a patient was injured to treat him, her diagnosis that the patient's jaw was fractured was permissible lay testimony. However, any testimony about the underlying cause of the patient's injury would be an hypothesis, and "the ability to answer hypothetical questions is the essential difference between expert and lay witnesses." *Id.* (emphasis supplied). "[W]hen a treating physician's testimony is based on an hypothesis, not the experience of treating the patient, it crosses the line from lay to expert testimony, and it must comply with the requirements of Rule 702[2] and the strictures of *Daubert*." *Williams,* 644 F.3d at 1317-18.

***

....A physician's opinion testimony beyond his observations during the course of treatment, or for the purpose of explaining the physician's decision-making process or the treatment provided, crosses the line from lay opinion testimony to expert testimony based on scientific, technical, or other specialized knowledge. *See Eberhart v. Novartis Pharmaceuticals Corp.,* 867 F. Supp. 2d 1241, 1253 (N.D. Ga. 2011) citing *Henderson*, 409 F.3d at 1300.

A determination of causation was not necessary for treatment by Dr. Bartholomew. As a result, it is **ORDERED** that Defendants' motion to strike is **GRANTED IN PART** as to Dr. Bartholomew's **Paragraph 8** Declaration statement that there is a causal relationship between Zalimeni's cervical issues/pain and the accident and **Paragraph 9** Declaration Statement that there is a causal relationship between the left shoulder complaints and the accident**.**

However, because Dr. Bartholomew's records and opinions were timely disclosed and as a treating physician he may testify, to the extent it is relevant, as to his observations and treatment, Defendants' motion is **DENIED IN PART** as to: **Paragraph 8** (undergo additional tests and possible treatment for Zalimeni's neck/cervical spine complaints - that he has not reached MMI

8

and is in need of diagnostic testimony and possibly treatment); **Paragraph 9** (that he has not reached MMI for his shoulder and is in need of diagnostic testing and possible orthopedist referral for the shoulder); and **Paragraph 11** (that he has not reached MMI for direct injuries to his left hand and fingers).

Further, it is **ORDERED** that Defendants' motion to exclude Dr. Bartholomew's opinions as to MMI based on his lack of qualifications and speculation, is **DENIED at this time**. The Court will reconsider the objection at trial, if requested.

## II.   <u>Motion for Summary Judgment</u>

## A.   <u>Standard of Review</u>

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).   Rule 56(c) provides as follows:

> ***(c) Procedures***
> ***(1) Supporting Factual Positions.*** A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> **(A)** citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> **(B)** showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.
>
> ***(2) Objection That a Fact Is Not Supported by Admissible Evidence.*** A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.
>
> ***(3) Materials Not Cited.*** The court need consider only the cited materials, but it may consider other materials in the record.

*(4) Affidavits or Declarations.* An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated.

FED.R.CIV.P. Rule 56(c).

The party seeking summary judgment bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). If the nonmoving party fails to make "a sufficient showing on an essential element of her case with respect to which she has the burden of proof," the moving party is entitled to summary judgment. Celotex, 477 U.S. at 323. "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Tipton v. Bergrohr GMBH-Siegen, 965 F.2d 994, 998-999 (11th Cir. 1992).

## B. **Findings of Fact**[4]

On May 23, 2019, Plaintiff Donald A. Zalimeni, Jr. (Zalimeni) initiated this maritime action (Jones Act case) for negligence, unseaworthiness, and maintenance and cure, against Defendants Cooper Marine & Timberlands Corp. (CMT) and Cooper/T. Smith Stevedoring Co.,

---

4 The facts are taken in the light most favorable to the non-movant. Tipton v. Bergrohr GMBH–Siegen, 965 F.2d 994, 998–999 (11th Cir. 1992). The "facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case." Priester v. City of Riviera Beach, 208 F.3d 919, 925 n. 3 (11th Cir. 2000).

Inc. (Smith).  (Doc. 1).  Summary judgment was granted in the Defendants' favor on Zalimeni's

claims for negligence and unseaworthiness, leaving only maintenance and cure.  (Doc. 27).

This case arises from injuries Zalimeni suffered on **May 6, 2016**, while employed by CMT

as a derrick crane[5] operator on the vessel MOODY, moored in Mobile County, Alabama (Port of

Mobile).  (Doc. 1 at 2).  The A-frame shive on the vessel was defective and prior to this date, had

been "spitting" grease on the A-frame deck, causing the crew to place absorbent material on the

deck to soak up the excess grease.  (Id. at 3). From time to time, the absorbent material would

become entangled with the crane's boom line and have to be removed.  (Id.) At 6:00 p.m. Zalimeni

climbed the stairs to the A-frame section of the crane to grease and inspect the shive.  (Id.)  After

completing the inspection and cleaning the crane's boom line, Zalimeni started to leave the area.

(Id. at 4).  Simultaneously, another individual moved the crane's boom to place it in its cradle.

(Doc. 1 at 4). The boom movement caused the vessel to shift which, when combined with the

greasy deck, caused Zalimeni to slip and fall.  (Id.) While trying to stop his fall, with arms

outreached, Zalimeni's gloved left hand was pulled into the shive resulting in severe damage.  (Id.)

At the time of the accident, the handling of Zalimeni's treatment was conducted by non-

party VONA Case Management, Inc. (with whom Defendants had contracted to manage health

care plans), including Laurie Cokel (for Birmingham treatment) and Darlene Arnold (Arnold) for

Mobile treatment).  (Doc. 51-2).  Additionally, Amy Slay (Slay), then an employee of Cooper/T.

Smith Stevedoring Company (now Assistant Vice President of Claims), was Zalimeni's case

manager during his post-accident treatment.  (Doc. 51-2 at 7-8; Doc. 51-3 at 2 (Dep. Slay at 7)).

---

5 Used to load/unload cargo at CMT's Chipco facility on the Mobile River.  (Doc. 22 at 2).

### 1.     Initial Treatment & Complaints: May 6, 2016-June 8, 2016

On **May 6, 2016**, Zalimeni was transported to UAB in Birmingham, Alabama, and was treated by Dr. Nileshkumar Chaudhari; four fingers on his left hand were surgically amputated. On **May 18, 2016**, Zalimeni reported to Case Manager Arnold, neck pain and stiffness that he believed was caused from the accident when he jerked his hand away from the cable; and his prior medical history including a cervical discectomy C 6/7. (Doc. 51-2 at 12, 14 (Slay/Arnold Progress Notes). On **June 8, 2016**, Arnold advised Slay of Zalimeni's complaints. (Doc. 51-2).

### 2.     Dr. Barbour (2016-2017)

On **May 31, 2016**, after completing treatment at UAB, his care was transferred to Dr. Thomas Barbour (Dr. Barbour), an orthopedic surgeon in Mobile, for treatment of his hand. (Doc. 49-1 at 2 (Dep. Barbour at 6)). Dr. Barbour recommended continued therapy (that Zalimeni was undergoing), he was given pain medications, and was instructed on wound care. (Id. at 2-3 (Dep. Barbour at 6-7)). On **June 14, 2016**, Dr. Barbour saw Zalimeni and "everything seemed to be doing well," he was on pain medication and nerve pain medication, instructed him to continue with wound care and strengthening mobilization, and to be off work another three (3) weeks. (Id. at 3 (Dep. Barbour at 7)). On **July 22, 2016**, Dr. Barbour saw Zalimeni and noted that he could return to work light duty with no use of the left hand. (Id. at 3-4 (Dep. Barbour at 7-8)). On **December 13, 2016**, Dr. Barbour saw Zalimeni and he was "improved," had soreness and cold intolerance because of "nerve issues," had "a little deficit of strength and stamina," "I felt like he was improving", gave him increased work restrictions and instructed him to return in 8 weeks and "felt like he would be at MMI at that point." (Id. at 4 (Dep. Barbour at 8)).

On **January 31, 2017,** Dr. Barbour saw Zalimeni and placed him at MMI for his hand and he was released to work with a five-pound lifting limit. (Doc. 49-1 at 5 (Dep. Barbour at 9)).  On **March 21, 2017,** Zalimeni returned to Dr. Barbour with some increased hand pain -- some residual issues (residual nail tissue) and they discussed neuroma excision.  (Id. at 5-6 (Dep. Barbour at 9-10)). On **April 24, 2017**, Zalimeni returned to Dr. Barbour and underwent a neuromal excision on his left hand. (Id. at 6 (Dep. Barbour at 10)). After that, Zalimeni "did okay at times...he was doing pretty well, had improved sensitivity, and hi[s] wounds didn't have any problems healing and seemed to be doing better. Was still have issues with it [hand], but seemed to be doing better." (Id.) On **July 31, 2017,** Dr. Barbour performed a second surgery (nail excisions and repairs)[6] on Zalimeni's hand to remove the nail bed and germinal matrix to prevent continued pain. (Id. at 6-7 (Dep. Barbour at 10-11)). On **September 6, 2017,** Dr. Barbour saw Zalimeni for a follow-up and noted that "he had marked improvement...pain improvement, and function was improved[]" -- he was given "a week and a half or so to get back to" MMI "as far as working" and he was asked to follow up in 6 weeks.  (Doc. 49-1 at 7-8 (Dep. Barbour at 11-12)).

On **October 31, 2017**, Dr. Barbour saw Zalimeni and noted (for the first time) his report of neck problems and that he had a history of prior cervical disc fusion before the accident.  (Id. at 8-9 (Dep. Barbour at 12-13)).  Dr. Barbour later testified that Zalimeni had not complained to him of cervical neck pain until that time. (Id. at 12-13 (Dep. Barbour at 22-23)). Dr. Barbour testified that an injury like the one Zalimeni experienced "can cause other injuries. But he never complained about it [neck/cervical issues]."  (Id. at 13 (Dep. Barbour at 23)).  Dr. Barbour also testified that

---

6 Described as: "the radial and ulnar nail bed and germinal matrix excisions and repairs versus continued nail bed issues. Then neuromas of the radial and ulnar digital nerves to the long and ring fingers which transferred intramuscularly into the palm of the hand."  (Doc. 49-1 at 7 (Dep. Barbour at 11)).

he opined that Zalimeni's cervical problems were not related to the accident.  (Id. at 8-9 (Dep. Barbour at 12-13)).  See also (Doc. 51-6 at 5 (Progress Notes)).

On **December 12, 2017**, Dr. Barbour placed Zalimeni at MMI for his hand, indicating there was nothing left that he could do to improve his hand. (Doc. 49-1 at 9 (Dep. Barbour at 13)).   Dr. Barbour testified that even if Zalimeni is still today periodically complaining of hand pain, he did not believe that surgery would help, and that he is at MMI.  (Id. at 9-10 (Dep. Barbour at 13-14)).

Concerning shoulder pain, Dr. Barbour testified that Zalimeni never complained of shoulder pain and that he did not observe any problems with his shoulder, adding that he would have expected Zalimeni to raise those complaints "at some point" during treatment if they had resulted from the accident. (Id. at 10-11 (Dep. Barbour at 14-15)).  As to whether Zalimeni's shoulder pain is related to the accident, Dr. Barbour testified "[i]t can be related under certain instances....where you've....had an obvious injury....[b]ut nothing like that was documented."  (Id. at 11 (Dep. Barbour at 15)).  As for the complex regional pain syndrome (CRPS), Dr. Barbour testified that Zalimeni "had no signs or symptoms" of this syndrome during his treatment. (Id. at 14 (Dep. Barbour at 25)).

### 3.   Dr. Burkett (2018)

On **February 22, 2018,** Zalimeni was treated by Dr. Jared Burkett (Dr. Burkett), an orthopedic surgeon in Mobile, Alabama. (Doc. 49-2 at 2 (Dep. Burkett at 6)).  At that time Dr. Burkett evaluated Zalimeni to determine if there was anything more that he could do for him.  (Id.)  Dr. Burkett concluded: there was no surgical intervention he would recommend for his hand; he had had some improvement with therapy and could try additional occupational therapy in the future; discussed Lyrica as an option for pain management ("not going to change his condition,

14

but hopefully it will make it....less painful and easier to live with[]"), as well as occupational therapy for functional maintenance and to control flare-ups (again, would not improve his underlying condition, just "functional maintenance"). (Id. at 4-5 (Dep. Burkett at 8-9)).

Also at that time, on his intake questionnaire, Zalimeni checked the boxes indicating that he was having pain in his neck, shoulder, arm, wrist, low back, and hand. (Id. at 6 (Dep. Burkett at 11)). However, Dr. Burkett did not recall Zalimeni voicing complaints about neck or shoulder pain during the exam, there was no notation of such by Dr. Burkett in his notes, and Dr. Burkett did not examine his neck and shoulder. (Id. at 6-7 (Dep. Burkett at 11-12)). Concerning neck or shoulder pain, Dr. Burkett testified that even if Zalimeni had complained of such pain, he could not say with any degree of medical certainty whether his complaints were related to the accident. (Id. at 7 (Dep. Burkett at 12)). As for CRPS, Dr. Burkett testified that Zalimeni "it is a possibility, but I can't say for sure[]" that CRPS is what he had, adding that he did not meet all the Budapest criteria for it though" -- "[c]ouldn't rule it out or in[.]" (Id. at 8-9 (Dep. Burkett at 16-17)).

Zalimeni sought an additional opinion and treatment to find a doctor who could help him with his pain and get him back to work. Defendant CMT agreed to pay for continued treatment for Zalimeni. (Doc. 49-3 (Dep. Zalimeni at 31-32)).

### 4. Dr. Kopp (2018-2020)

On **May 10, 2018**, Zalimeni began additional treatment with Dr. Theodore Kopp (Dr. Kopp), a pain management specialist in Mobile, Alabama. (Doc. 49-4 at 2-3 (Dep. Kopp at 5-6)). Dr. Kopp understood that Zalimeni was initially being referred to him for pain management for his hand. (Id. at 3 (Dep. Kopp at 6)). Additionally, however, during treatment, Dr. Kopp was referring Zalimeni for stellate blocks as an attempt to see about placement of the synthetic ganglion

nerve to help with the hand pain -- "I was trying to see if any pain in the hand was being referred to by the neck (Doc. 51-5 at 5-6 (Dep. Kopp at 18-19)). Dr. Kopp testified that his treatment of Zalimeni was dual purpose: managing pain but also to help Zalimeni maintain some of his function. (Doc. 49-4 at 4 (Dep. Kopp at 7)).

At the first appointment on May 10, 2018, Dr. Kopp noted that Zalimeni's chief complaints were chronic hand pain and long-term drug therapy, but no shoulder or neck complaints were noted. (Doc. 49-4 at 4-5 (Dep. Kopp at 7-8)). Dr. Kopp prescribed Lyrica, Tramadol and Mobic to help Zalimeni manage his hand pain. (Id. at 5 (Dep. Kopp at 8)).

On **June 8, 2018**, Dr. Kopp saw Zalimeni and prescribed an EMG. (Doc. 51-5 at 5 (Dep. Kopp at 18)). On **July 27, 2018**, neck issues were revealed when Dr. Kopp performed the EMG on Zalimeni, that indicated a chronic and old abnormal finding -- cervical radiculopathy, left chronic, possible "old" without signs of active denervation currently (pinched or damaged nerve in his neck existed but it was old - "we don't know how old[]" but "could be six months old, could be a year, could be six years old[,]" or "could be 10 years[]." (Doc. 49-4 at 6-7 (Dep. Kopp at 9-10); Doc. 51-5 at 7 (Dep. Kopp at 20); Doc. 51-7 (7/27/18 Report)). It was noted that Zalimeni reported muscle aches, weakness, joint pain, and back pain. (Doc. 51-7). The notes reflect the "new problem" of chronic pain syndrome: "[a]t this stage, the pain itself may have become a syndrome, regardless of the original etiology. There may be multiple contributing factors for this...." (Doc. 51-7 at 4). Dr. Kopp diagnosed chronic pain syndrome, and his orders included "cervical radiculopathy - pre-existing condition likely aggravated by WC injury[,]" and epidural steroid injection, cervical. (Id. at 5-6). Dr. Kopp proscribed an epidural for treatment. (Doc. 51-5 at 7 (Dep. Kopp at 20)). Dr. Kopp's office notes indicate that Zalimeni's cervical condition was

16

likely aggravated by his traumatic injury (the accident).  (Id.)  Dr. Kopp testified he was aware of

Zalimeni's prior neck problems (in the 1990s) when he underwent a surgical fusion procedure, and

that he agreed with Dr. Barbour  (that his neck problems were not related to the accident.  (Doc.

49-4 at 7 (Dep. Kopp at 10)).  The EMG also showed moderate left carpal tunnel syndrome without

signs of active denervation currently.  (Id.)

On **August 27, 2018,**[7] Dr. Kopp noted that Zalimeni's carpal tunnel syndrome was "as

likely as not" related to the accident - more of a close call or 50/50.  (Doc. 49-4 at 7-8 (Dep. Kopp

at 10-11)).  CMT paid for Zalimeni's carpal tunnel treatment.  (Id. at 8 (Dep. Kopp at 11)).  Per

Dr. Kopp, "it was a coin flip, basically" as to whether it was related to the accident.  (Doc. 51-5 at

8 (Dep. Kopp at 21)).  At the August 27th appointment, Dr. Kopp discussed with Zalimeni whether

his neck pain was related to the injury.  (Doc. 51-5 at 8-9 (Dep. Kopp at 21-22)).

On **January 16, 2019,** Dr. Kopp placed Zalimeni at MMI for his carpal tunnel syndrome.

(Doc. 49-4 (Dep. Kopp at 11)).  Dr. Kopp's notes reflect "pre-existing condition (cervical) likely

aggravated by WC injury." (Doc. 51-5 at 9 (Dep. Kopp at 24, 71); Doc. 51-5 at 11).  Per Dr. Kopp,

---

7 On August 17, 2018, Slay emailed Arnold stating Zalimeni "kept thinking they were going to do
injections by his neck but didn't want to wait until October to have that done."  (Doc. 51-2 at 18).  Arnold
emailed Slay noting a record mentioning CESI for cervical radiculopathy, asking if the cervical issue has
been related to the work injury.  (Doc. 51-1 at 16).  In response, Slay stated that Zalimeni had not been
treated for cervical issues, "I see the note states 'pre-existing condition likely aggravated by WC injury.' I
can see the carpal tunnel but not his back." (Doc. 51-2 at 16).  On August 27, 2018, Arnold spoke with Dr.
Kopp's PA Mike Hite regarding Zalimeni's cervical issues:

> .... He consulted with Dr. Kopp about the cervical issues. Dr. Kopp advised that the
> injection in recommended to see if it will alleviate the nerve pain in the hand not so much
> for the cervical radiculopathy. The EMG/NCV did show he had C8 cervical radiculopathy
> but this is to be done as a diagnostic tool to see if it will help the nerve pain in the fingers
> and hand. He did not relate the cervical issue to the work injury.

(Doc. 51-6 at 6 (Arnold/Slay Progress Notes)).

it was his opinion that a CESI (cervical epidural steroid injection) and MRI, without contrast, were reasonable and necessary and appropriate treatment for the diagnosed cervical condition. (Doc. 51-5 at 9 (Dep. Kopp at 24); Doc. 51-5 at 11). At that time, Dr. Kopp noted "preexisting condition [cervical] likely aggravated by work comp injury." (Doc. 51-5 at 9 (Dep. Kopp at 24)).

From **March-April 2019**, Dr. Kopp continued this finding and requested CESI for Zalimeni, but it was not approved. (Doc. 51-5 at 9-10 (Dep. Kopp at 24-25)). Dr. Kopp's notes reflect that the cervical condition was aggravated by the accident, in February, March, and April of 2019, until he was informed by the insurance company, they (insurance company) lacked evidence that "it's (cervical condition) linked to the work comp claim." (Id. at 9-10 (Dep. Kopp at 24-25). At some point it was brought to Dr. Kopp's attention that Zalimeni had made no complaints of neck or shoulder pain for some time after the accident. (Id.)

On **May 14, 2019**, Dr. Kopp saw Zalimeni and added a new diagnosis of complex regional pain syndrome (CRPS) because he thought it would help him receive stellate blocks. (Doc. 49-4 at 11-13 (Dep. Kopp at 27-29)). However, Dr. Kopp testified that it would be unusual for CRPS to show up 2-3 years after the initial injury -- that such usually shows up within weeks to months post-injury. (Id. at 13 (Dep. Kopp at 29)).

On **November 20, 2019**, Dr. Kopp noted Zalimeni had begun treatment with Louisiana physicians for shoulder pathology. (Doc. 49-4 at 8 (Dep. Kopp at 11)). Dr. Kopp testified that Zalimeni did not complain of shoulder issues before that time. (Id. at 9 (Dep. Kopp at 12)). Dr. Kopp testified that it would be virtually impossible to say to a reasonable degree of medical certainty that Zalimeni's shoulder problems were somehow causally related to the accident. (Id.)

In **April 2020**, Dr. Kopp saw Zalimeni and continued to provide him with the same treatment.  (Doc. 49-4 at 13 (Dep. Kopp at 29)).  Per Dr. Kopp, if he had received approval to get the MRI and CESI injection, he would have been able to help Zalimeni's conditions "[a]s it relates to anything coming from the neck, yes."  (Id.)  Dr. Kopp added that Zalimeni would benefit from meeting and being evaluated by a psychologist who specialized in traumatic events to help him cope with his amputation injury.  (Id. at 14 (Dep. Kopp at 32)).

In contrast to his January-April 2019 notations *supra*, when asked whether the though the accident aggravated a preexisting cervical condition in Zalemini, Dr. Kopp testified that because of the timing he does not think it is possible to link the cervical injury he received "back then" (in the 1990s) to "what's going on with his neck now."  (Doc. 49-4 at 14-15 (Dep. Kopp at 32-33)).

### 5.    Dr. Bartholomew (2019)

On **August 13, 2019**, Zalimeni was examined by Dr. Bartholomew.  (Doc. 51-6 at 7-8).  Dr. Bartholomew indicated treatment for Zalimeni's complaints and specified as follows:

> Mr. Donald Zalimeni .... states he was ambidextrous until his recent injury, who was then slated for evaluation. He presents with his wife accompanying him. He gives a history of being injured 05/06/2016, when he was working as a crane operator. It sounds a little complex, but evidently......the crane shook, he kind of tripped or slipped, falling forward towards this assembly. The right hand was evidently able to be caught on kind of the brace or structure, but the left hand caught the cable, and he was pulled up into this pulley-type assembly. Basically, when the hand got caught in this assembly, crushing and amputating some of his fingers, and he obviously tried to jerk and pull his left shoulder at the same time to get his hand out of it. The records really speak for themselves at this point. He states he has had 2 different surgeries on the left hand to try to get rid of the severe burning and hypersensitivity he has. Evidently, one was done April 2017 without any relief palm, when they kind of burned the hands. That gave him maybe some short-term relief of about 3 weeks. He continues with severe pain in the left palm. Itis a hypersensitivity. It is cold. It is like a phantom limb pain. Also, in the fingers. He has pain coming from this area going up his arm. Usually, is it approximately to elbow, occasionally to the shoulder area.  He also has shoulder area pain, and he also has neck pain. Neck pain is pretty constant pain, kind of a dull ache, with pain

radiating down to the elbow. At that point, it becomes hard to differentiate from the pain coming up from the hand.  He states Dr. Kopp at one point wanted to do a cervical injection.  It sounded like stellate ganglion block, but the day before when they realized that he had not had any imaging studies done, they wanted to postpone it, and it has never been able to be done since that time.

Past medical does include what sounds like a CS-7 anterior cervical fusion in 1998, and some lumbar injections in 2002.

\*\*\*

Physical examination shows he is missing approximately the last distal half of the last 4 fingers on the left. The left hand is cold to touch.  It is slightly blue and it is extremely sensitive, especially in the palm.  Neck exam shows some mild left-sided tenderness.  He does have some spasm in the left trapezius area. He has minimal tenderness in the left shoulder, but he cannot elevate his left arm above the level of his shoulder.  He has pain with internal rotation and really, cannot externally rotate his shoulder at all, as he cannot pick it up above the level of his shoulder.

I have an old MRI scan from 01/28/2002 of the lumbar spine, which I do not think is contributory to the present issue, although he did have a left L5-S1 herniation.

\*\*\*

(Doc. 51-6 at 7-8).  Dr. Bartholomew diagnosed Zalimeni with left hand CRPS/RSD, left shoulder

pathology, and cervical pain with cervical radiculopathy.  (Id. at 8).  Dr. Bartholomew concluded:

I would like to get an MR scan of the cervical spine and see what is going on with that prior to recommending stellate ganglion blocks, but I do think, regardless, he is going to require the stellate ganglion blocks, and he also requires MRI scan of the left shoulder. It looks like he is almost developing a frozen shoulder. From the mechanism I would state that the left shoulder is likely related to this injury. I will clearly state I am not an orthopedist, but it sounds like to me it has progressively gotten worse. I discussed with him and his wife that  if he gets a response to a stellate ganglion block, one option would be a sympathectomy. I personally was trained to go posteriorly, but there are newer ways of doing it, including thorascopically, which I am not familiar with, at least, not even be able to do it myself. The other option may be a cervical epidural steroid injection and possible dorsal column stimulator. Personally, I would start with the stellate ganglion blocks, and then discuss with the patient the option of thorascopic sympathectomy or cervical dorsal column stimulator. Also, obviously, depending on results of MRI scan of the shoulder and neck, these areas may have to be addressed also.

(Id.)

On **October 22, 2019**, Dr. Bartholomew examined Zalimeni and noted as follows:

20

Mr. Donald Zalimeni returns today continuing with multiple complaints.  He has neck pain.  It is at the base of the neck on the left.  He also has a separate shoulder area pain. The shoulder area pain is worse with raising his arm and certain motions, and at times he gets pain to the elbow.

He also continues with the left hand symptoms.  He gets a cold, very sensitive feeling in his hand.  He also has some phantom limb pain of the fingers.

He is on tramadol and Lyrica.  They take the edge off only.

Physical exam shows it appears he has normal strength in the upper extremities, at least which I could test.  Obviously I could not test the hand intrinsics on the left. The left hand is cool to the touch, and the palm is very sensitive.

He does have some left trapezius spasm and tenderness.

He has significant tenderness in the anterior aspect of the left shoulder.  He has significant loss of both internal more than external rotation.  He has difficulty elevating the left arm above the area of the shoulder.

MRI scan of the cervical spine, 10/09/2019, report describes C2-3 left facet changes, C3-4 disk- osteophyte complex with left facet changes, and a CS-7 bulge. I reviewed these films.  I think if you look at images 4 and 5 of 11 of the T2 sagittals, C3-4 does have a herniation off to the left.  T1-2 also has a right-sided herniation on image 7 of 11 of the T2 sagittals.  It does go to the cord.

MRI scan of the left shoulder was read as no abnormalities.

Despite no abnormalities shown on the MRI scan of the left shoulder, he obviously has shoulder pathology. I do know labral tears can not show up on the MRI, and sometimes they require an MR arthrogram.  I would like to get him to an orthopedist and not order that myself.  He obviously has shoulder pathology and losing some shoulder muscle bulk.

I do think he requires a left stellate ganglion block.  I think we can do this.  The MRI scan of the neck is not significant enough I think to be causing the symptoms in the left hand.....Dr. Aimee Walsh, who is an anesthesiologist who does pain management.  We will see about helping the patient set that up.

(Doc. 52-3 at 1).

On **October 1, 2020,** Dr. Bartholomew submitted a Declaration in which he opined that:

8.  **[Stricken]** Further, Mr. Zalimeni is not at maximum medical improvement for [cervical spine condition] and is in need of diagnostic testing and possibly treatment. My opinion on this is consistent with the opinions of Dr. Kopp, whose records I reviewed.

9.  **[Stricken]** Further, Mr. Zalimeni is not at maximum medical improvement for the shoulder complaints and he is in need of diagnostic testing, and depending on the result of that testing, possibly a referral to an orthopedist[] for treatment.

10.  My review of the records from Results Physical Therapy show that the therapists were administering treatment to Mr. Zalimeni's cervical and thoracic spines to include traction and trigger point (dry needle) injections, and also administered trigger point injections to his left shoulder area, posteriorly and anteriorly, and scapular.

11. I further do not believe Mr. Zalimeni is at maximum medical improvement for the direct injuries to the left hand and fingers.

12.  In my Clinic Note, I state Mr. Zalimeni requires stellate ganglion blocks, which are both diagnostic and therapeutic in nature. If the blocks are successful, this would restore some ability of Mr. Zalimeni to function because it could potentially reduce his neuropathic pain significantly.

13.  Further, if the stellate ganglion block proves successful, this would provide diagnostic benefits and show that Mr. Zalimeni may be a candidate for a more definitive thorascopic sympathectomy procedure, which could provide more permanent pain relief, and hence restore Mr. Zalimeni's ability to function and perform the activities of daily living.

Doc. 51-6 (Decltn. Bartholomew at ¶¶8-13).

### 6.    CMT's maintenance and cure history

From the time he was injured, the Defendants paid Maintenance/Cure for Zalimeni at the rate of $40/day (or $1,606.36/week) until the 3-year anniversary of the incident, and paid medical expenses for Zalimeni past the 3-year mark.  (Doc. 49-5 at 2 (Dep. Slay at 31)).  Per Defendants: "From the date of the accident through his final checks on April 29, 2019, CMT paid Zalimeni approximately $560 in maintenance and $1,606 in supplemental wages every two weeks (... except[].....periods in which Zalimeni worked).....CMT also paid for Zalimeni's medical care until

22

after Dr. Kopp placed him at final MMI for carpal tunnel on January 29, 2019. ...." (Doc. 49 at 9 (referencing Dr. Slay's deposition and payments (Doc. 49-5 at 31-32, Exs. 5 and 6 thereto))).

### C.   Conclusions of Law

#### 1.   Maintenance & Cure - MMI

Zalimeni alleges two (2) counts against the Defendants for maintenance and cure (Counts Five and Six) based on his left hand injury and "sustained injuries to other parts of his left arm, including his cervical spine[]" for which he claims Defendants discontinued paying for medical treatment even though Dr. Kopp had not placed him at MMI. (Doc. 1 at 4 at ¶¶23-24, 31).

Defendants move for summary judgment on Zalimeni's claims, contending that all of his treating physicians concluded that he has reached MMI and that Zalimeni's reliance on the findings of Dr. Bartholomew are improper. In response, Zalimeni contends that the Defendants' case managers failed to accurately report his medical history accurately to physicians Drs. Barbour and Kopp -- essentially tainting the medical history/reporting chronology. Zalimeni adds that Dr. Bartholomew's records indicate that he has not reached MMI.

As set forth in Smith v. BP America, Inc., 522 Fed. Appx. 859, 863 (11th Cir. 2013) (citations omitted): "[a] seaman's right to maintenance and cure is implicit in the contractual relationship between the seaman and his employer, and is designed to ensure the recovery of these individuals upon injury or sickness sustained in the service of the ship." "Maintenance and cure"[8]

---

8 Zukowski v. Foss Maritime Co., 2013 WL 1966001, *6 (S.D. Ala. May 10, 2013):

"Maintenance" is "a living allowance" paid on a per diem basis, while "cure" is intended to "cover[] nursing and medical expenses." *Cabrera Espinal*, 253 F.3d at 631 (citation omitted); *see also Kasprik v. United States,* 87 F.3d 462, 464 (11th Cir.1996) ("It is a well recognized rule in admiralty that when a seaman is injured or becomes ill while employed aboard a vessel, he is entitled to daily subsistence and medical treatment until his maximum cure has been reached."). The obligation to pay maintenance and cure continues until such time as the seaman has reached the point of

is thus a seaman's remedy (*i.e.*, compensation) if he is injured while employed on a ship and he recovers such benefits, from his employer and/or the vessel owner, until the time of maximum cure or maximum medical improvement (MMI).  See, e.g., Thomas v. Carnival Corp., 573 F.3d 1113 (11th Cir. 2009); Cabrera Espinal v. Royal Caribbean Cruises, Ltd., 253 F.3d 629, 630-631 (11th Cir. 2001); Hall v. Noble Drilling (U.S.), Inc., 242 F.3d 582, 586 (5th Cir. 2001); Crow v. Cooper Marine & Timberlands Corp., 657 F.Supp.2d 1248, 1251-1252 (S.D. Ala. 2009); Bloom v. Weeks Marine, Inc., 225 F. Supp. 2d 1334, 1335 (M.D. Fla. 2002).  "A vessel owner's duty to provide maintenance and cure embraces not only the obligation to provide a subsistence allowance and to pay for medical expenses actually incurred by the seaman, but to take all reasonable steps to insure that the seaman, when he is injured or becomes ill, receives proper care and treatment."  Crow, 657 F.Supp.2d at 1252.  Thus, a shipowner's duty to pay maintenance and cure is "virtually automatic." Baucom v. Sisco Stevedoring, LLC, 506 F.Supp.2d 1064, 1073 (S.D. Ala. 2007).

To recover for maintenance and cure, a plaintiff need only prove that: 1) he was employed as seaman, 2) the injury/illness occurred, manifested, or was aggravated[9] while in the ship's service, 3) the wages to which he is entitled, 4) expenditures for medicines, medical treatment, board, and lodging; and 5) the injury/illness occurred without willful misbehavior[10] by the seaman.

---

maximum cure. *See Nichols v. Barwick*, 792 F.2d 1520, 1523 (11th Cir.1986); *Gooden v. Sinclair Refining Co.,* 378 F.2d 576, 579 (3rd Cir.1967) ("The obligation to provide maintenance and cure continues until maximum medical recovery has in fact been achieved.").

 "Maintenance" is the right to food/lodging. "Cure" is the right to necessary/appropriate medical services.

 9  *Stevens v. McGinnis, Inc., 82 F.3d 1353, 1357–58 (6th Cir.1996)* ("A shipowner must pay maintenance and cure for any illness which occurred, was aggravated, or manifested itself while the seaman was in the ship's service.")

 10  Per Sanders v. U.S., 2006 WL 2583571, *3 (S.D. Ala. Sept. 6, 2006): "...it has long been held that while fault of the seaman will forfeit the right to maintenance and cure, it must be 'some positively vicious conduct-such as gross negligence or willful disobedience of orders." ' *Warren v. U.S.,* 340 U.S.

Johnson v. Cenac Towing Inc., 468 F.Supp.2d 815, 832 (E.D. La. 2006), *vacated on other grounds*, 544 F.3d 296 (5th Cir. 2008)).  See also Crow, 657 F.Supp.2d at 1252; Crow v. Cooper Marine & Timberlands Corp., 2009 WL 103500, *3-4 (S.D. Ala. Jan. 15, 2009).  The seaman's burden is "relatively light."  Freeman v. Thunder Bay Transp. Co., 735 F. Supp. 680, 681 (M.D. La. 1990). See also Baucom, 506 F.Supp.2d at 1072-1073 (citations omitted) ("[s]uch a light burden is consistent with the notion that this doctrine was crafted so that a seaman's right to maintenance and cure 'is so inclusive as to be relatively simple, and can be understood and administered without technical conditions[]'").  Moreover, "[a] seaman may recover maintenance and cure even for injuries or illnesses preexisting the seaman's employment unless that seaman knowingly or fraudulently concealed his condition from the vessel owner at the time he was employed." Jauch v. Nautical Servs., Inc., 470 F.3d 207, 212 (5th Cir. 2006); McCorpen v. Central Gulf S.S. Corp., 396 F.2d 547, 548 (5th Cir. 1968).[11]

However, maintenance and cure "is not an open-ended duty[]" or "mandatory lifetime health insurance policy for injured seamen[]" Baucom, 506 F.Supp.2d at 1074 and 1076, and "does not hold a ship to permanent liability for a pension, neither does it give a lump-sum payment to offset disability based on some conception of expectancy of life[,]" Farrell v. United States, 336 U.S. 511, 519 (1949).  Instead, the duty extends during the period when the seaman is incapacitated and continues until he reaches MMI. Vaughan v. Atkinson, 369 U.S. 527, 531 (1962). That is when

---

523, 528 (1951) (citations omitted). "Only some wil[l]ful misbehavior or deliberate act of indiscretion suffices to deprive the seaman of his protection." *Aguilar v. Standard Oil Co.*, 318 U.S. 724, 731 (1943)…."

11 Decisions of the former Fifth Circuit rendered prior to October 1, 1981, are binding precedent on the Eleventh Circuit. Bonner v. City of Prichard, Ala., 661 F.2d 1206, 1209 (11th Cir. 1981).

the burden shifts to defendant(s), "to prove that the seaman has reached the point of maximum medical improvement." Costa Crociere, S.p.A. v. Rose, 939 F. Supp. 1538, 1548 (S.D. Fla. 1996).

MMI is the maximum medical cure, which is "achieved when it appears probable that further treatment will result in no betterment of the seaman's condition…where it appears that the seaman's condition is incurable, or that future treatment will merely relieve pain and suffering but not otherwise improve the seaman's physical condition, it is proper to declare that the point of maximum cure has been achieved." Pelotto v. L&N Towing Co., 604 F.2d 396, 400 (5th Cir. 1979) (citations omitted). When assessing MMI, the decision to terminate maintenance and cure "should be unequivocal[,]" Tullos v. Resource Drilling, Inc., 750 F.2d 380, 388 (5th Cir. 1985) and "[a]ll available medical evaluations should be considered[]" Lee v. Metson Marine Servs., Inc., 2012 WL 5381803, *3 (D. Hawai'i Oct. 31, 2012).

As explained in Alario v. Offshore Service Vessels, LLC, 2011 WL 5403116, *4, *6 (E.D. La. Nov. 8, 2011) (concluding that MMI had been reached, after "[g]iving the testimony a fair reading and construing any ambiguity in favor of the Plaintiff....any further treatment is merely palliative in nature[]" (internal citations omitted):

> The cut-off date for both maintenance and cure is not the point at which the seaman recovers sufficiently to return to work[]"... Rather, the point of maximum medical improvement has been determined to be when "it appears probable that further medical treatment will result in no betterment of the seaman's condition."...
>
> ***
>
> ....see Lodrigue v. Delta Towing, LLC, 2003 WL 22999425, at *6 (E.D.La. Dec. 19, 2003)("Generally, the obligation to provide maintenance and cure ends when a doctor provides a qualified medical opinion that plaintiff has reached MMI."); accord Owens v. Abdon Callais Offshore, LLC, 2011 WL 2443687, at *8 (E.D. La. June 14, 2011); Ledet v. Smith Marine Towing Corp., 2011 WL 1303918, at *9 (E.D.La. Apr. 4, 2011); Saverese v. Pearl River Navigation, LLC, 2010 WL 3720907, at *6 (E.D.La. Sept. 14, 2010); Brunet v. Int'l Marine, LLC, 2010 WL 743516, at *2 (E.D.La. Feb. 23, 2010); Commings v. Mike Hooks, Inc., 2008 WL 3975608, at *8 (E.D.La. Aug. 25, 2008), as well as other physician opinions suggesting Plaintiff has reach MMI. See McGhee v. Pride Offshore, Inc., 2007

WL 4144955, at *3 (E.D.La. Nov. 19, 2007)(finding MMI where medical doctor has determined it is probable that further treatment will result in no betterment in the claimant's condition); *Harrison v. Diamond Offshore Drilling, Inc.,* 2008 WL 708076, at * 17 (E.D.La. Mar. 6, 2008)(finding MMI where physician testified plaintiff could return to work with some physical restrictions and no further surgical treatment would better plaintiff's condition). Dr. Huddleston acknowledges Plaintiff's ongoing complaints of pain and suggests injections and physical therapy to relieve and manage this pain, but not one physician has opined that Plaintiff is suffering from a medical condition at this time which can be improved or cured..... a recommendation for relief or management of pain alone does not prevent a finding of MMI. *See Pelotto v. L & N Towing Co.,* 604 F.2d 396, 400 (5th Cir.1979)*(*"Thus, where it appears that the seaman's condition is incurable, or that future treatment will merely relieve pain and suffering but not otherwise improve the seaman's physical condition, it is proper to declare that the point of maximum cure has been achieved."); *see also Owens,* 2011 WL 2443687, at *8 (" 'Where it appears that the seaman's condition is incurable, or that further treatment will merely relieve pain and suffering, but not otherwise improve the seaman's physical condition, it is proper to declare that the point of maximum medical cure has been achieved.' "); *Ledet,* 2011 WL 1303918, at *9 (finding MMI where physician could not be bettered from a physical and functional standpoint, leaving pain as the only outstanding issue); *Commings,* 2008 WL 3975608, at *8–9 (finding MMI where physicians recommended treatment of anti-inflammatory medication, heat, and physical therapy for plaintiff's low back pain and stated any type of pain management for plaintiff's cervical spine would be palliative treatment); *Gorum v.. Ensco Offshore Co.,* 2002 WL 315284460, at *5 (E.D.La. Nov. 14, 2002)("If 'future treatment will merely relieve pain and suffering,' then MMI has been reached.").

See also e.g., Hedges v. Foss  Maritime Co., 2015 WL 3451347, *4-5 (W.D. Wash. May 29, 2015) (discussing MMI and palliative care).

Any ambiguities regarding maintenance "are to be resolved [by the Court] in favor of the seaman[,]" "who are its wards." Vaughan v. Atkinson, 369 U.S. 527, 531-532 (1962) ("[a]dmiralty courts have been liberal in interpreting this [maintenance and cure] duty for the benefit and protection of seaman who are its wards....When there are ambiguities or doubts, they are resolved in favor of the seaman[]") (internal quotation marks and citation omitted) (the Vaughan rule)).

See, e.g., Flores v. Carnival Cruise Lines, 47 F.3d 1120, 1123 (11th Cir. 1995) (quoting Vaughan).

See, also e.g., Johnson v. Marlin Drilling Co., 893 F.2d 77, 80 (5th Cir. 1990) ("...in cases of maintenance and cure…it is crucial to ensure that the rule stated in *Vaughan*, regarding the

existence of ambiguities and doubts, is applied correctly....[U]nder the *Vaughan* rule, the possibility of physical improvement, expressed by [the seaman's ....doctor], would require a finding in favor of [the seaman][]").[12]  "The broad purposes which maintenance and cure payments serve should not be defeated 'by restrictive and artificial distinctions....If leeway is to be given in either direction, all the considerations which brought the liability into being dictate it should be in the sailor's behalf.'" Guidry v. The Offshore Drilling Co., 2007 WL 519761, *3 (W.D. La. Feb. 15, 2007) (citing Johnson, 893 F.2d at 79)).

Upon consideration, the Court finds that genuine issues of material fact exist regarding Zalimeni's attainment of MMI, which precludes summary judgment. Accordingly, Defendants' motion for summary judgment as to Zalimeni's maintenance and cure claims is **DENIED.**

### 2.   <u>Maintenance & Cure -- Damages</u>[13]

In his complaint, Zalimeni alleges that he is entitled to receive at least $114.74 per day maintenance owed to him as well as the costs of his medical and medical monitoring expenses; and seeks "any and all damages, general or special, to which he may be entitled pursuant to the statutory and common law[.]" (Doc. 1 at 8).  Zalimeni states as follows:

---

12 Gorum v. Ensco Offshore Co., 2002 WL 31528460, *6-7 (E.D. La. Nov. 14, 2002) (discussing cases applying Vaughan: "*See also In re Sirret Offshore Towing Company,* 1997 U.S. Dist. LEXIS 13408, *15, *16-17 (E.D.La.1997) ("[T]here is conflicting testimony between two board certified orthopedic surgeons as to exactly when [plaintiff] reached maximum medical cure....[A]ny doubt...must be resolved in favor of [plaintiff]."); *Williams v. American River Trans. Co.,* 1996 U.S. Dist. LEXIS 14140, *10-11 (E.D.La.1996) (holding that continuing maintenance and cure is owed when doctors dispute MMI, starting from the date the shipowner discontinued maintenance and cure based on a finding by one doctor of MMI)[]"). See also generally Wolf v. McCulley Marine Servs., Inc., 2012 WL 4077240 (M.D. Fla. Sept. 17, 2012) (dealing with a conflicting medical evidence scenario); Halcomb v. Kimberly Clark Tissue Co., 2000 WL 1802071 (S.D. Ala. May 31, 2000) (finding ambiguities existed as to whether a seaman reached MMI, despite a medical finding of MMI, because the finding was based on a mere "projection" and there was no showing he was "unequivocally diagnosed as reaching MMI[]").

13 As summary judgment has been granted in Defendants' favor on Zalimeni's other claims, the only damages which would be recoverable are those limited to his maintenance and cure claim.

62.  As a direct and proximate result of COOPER's and SMITH's joint tortious conduct, Plaintiff has suffered serious and grievous injuries to his mind and body. Plaintiff has been damaged in the following particulars:

(a) Plaintiff has suffered physical pain and mental anguish and will continue to suffer great pain of body and mind throughout his lifetime;

(b) Plaintiff has incurred medical, pharmaceutical, and other expenses, and will incur medical, pharmaceutical, and other expenses in the future due to his injury;

(c) Plaintiff suffers a physical impairment and will continue to suffer this impairment in the future due to his injuries;

(d) Plaintiff has suffered lost earnings and will suffer the loss of ability to earn income in the future because of his injuries;

(e) Plaintiff seeks exemplary damages to punish COOPER for its willful conduct.

63.  Plaintiff seeks attorney fees and costs as provided by law.

64.  Plaintiff seeks any and all other damages, general or special, to which Plaintiff may be entitled pursuant to General Maritime Law, statutory, and common law.

(Doc. 1 at 9).  In the Initial Disclosures, Zalimeni described his damages as follows: "Plaintiff is claiming damages for past and future medic[al] expenses, and consequential damages for defendant's failure to pay or the wrongful termination of maintenance and cure. These damages have yet to be calculated." (Doc. 49-7 at 5).  Defendants requested a detailed damages supplement from Zalimeni, but none was provided. (Doc. 49-8).  There is nothing before the Court providing any information regarding the specific damages Zalimeni seeks in this case.

Damages for maintenance and cure include: 1) an employer's negligent failure to pay maintenance and cure; and/or 2) an employer's willful, wanton or arbitrary failure to pay maintenance and cure renders (compensatory damages, attorneys' fees, and punitive damages). See, e.g., Atlantic Sounding Co. v. Townsend, 557 U.S. 404 (2009); Vaughan v. Atkinson, 369

29

U.S. 527 (1962); Garay v. Carnival Cruise Line, Inc., 904 F.2d 1527 (11th Cir. 1990).  Defendants contend that Zalimeni should be barred from offering damages evidence because he has failed to include a computation of damages, to date, instead only referencing broad categories.  Defendants argue Zalimeni has thus failed to disclose his claimed damages, meriting their exclusion at trial, and meaning there is no damages amount upon which this Court can rely on summary judgment. In response to Defendants' motion for summary judgment, Zalimeni has failed to address the issue of computation of damages and has not provided any substantive discussion of this issue or evidence in support of same.

Defendants are correct that a review of the record reveals that Zalimeni has not specified his damages, or disclosed same with detail, to date.  Under the Federal Rules of Civil Procedure, the Scheduling Orders of this Court, and the agreement of the parties, the Defendants were entitled to, as part of Zalimeni's initial disclosures, both "a computation of each category of damages claimed by" and "documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based, including materials bearing on the nature and extent of injuries suffered." Fed. R. Civ. P. 26(a)(1)(A)(iii); Doc. 15 at 2 at ¶3; Doc. 32 at 2 at ¶¶4, 7. Nevertheless, "[f]ailure to comply with Rule 26 disclosures is not a basis for summary judgement."  Torres v. First Transit, Inc., 2018 WL 4469026, *4 (S.D. Fla. Sept. 18, 2018). However, such failure *may* provide a basis to exclude submission of damages evidence at trial. *In re Mirabilis Ventures, Inc.*, 2011 WL 3236027, *5 (M.D. Fla. July 28, 2011) ("Where a party fails to properly identify a category of damages or to provide the calculations underlying it, it is within the court's discretion to exclude evidence relating to those damages[]") (citing *Mee Indus. v. Dow Chemical Co.*, 608 F.3d 1202, 1221–1222 (11th Cir. 2010)).

In the discretion of this Court, the Court finds that Zalimeni's failure to provide damages computation is neither fatal to his case nor a basis upon which summary judgment should be summarily granted.  Particularly in a seaman's maintenance and cure case where the seaman "are its wards."  Vaughan, 369 U.S. at 532.  This is not a situation where a plaintiff has failed to provide *any* identification or description of the damages sought.  Zalimeni's complaint, Paragraphs 62-64, provide enough to place Defendants on notice regarding *at least some* of the damages' range (e.g., medical expenses, lost earnings/future income, etc.).  Moreover, as this case is set for a January 2021 non-jury trial, the Court is satisfied that Zalimeni can cure any deficiencies and provide more specifics regarding damages in advance of trial, at which time Defendants may respond with any objections, which the Court will take under consideration.  As such, it is **ORDERED** that Zalimeni shall submit detailed disclosures and information (including any and all documentation in support) regarding any/all damages sought in this case, on or before **November 20, 2020**.  As needed, the Court will address damages in greater detail at the December 10, 2020 Final Pretrial Conference.

## III.   Conclusion

Accordingly, it is **ORDERED** that Defendants' motion to strike (Doc. 52) is **GRANTED in part** and **DENIED in part** as set forth *supra*; and Defendants' motion for summary judgment as to maintenance and cure (Doc. 49) is **DENIED.**

**DONE** and **ORDERED** this the **5th** day of **November 2020.**

/s/Kristi K. DuBose
**KRISTI K. DuBOSE**
**CHIEF UNITED STATES DISTRICT JUDGE**